**Warren SMITH, et al., Plaintiffs**

v.

**CARBIDE AND CHEMICALS CORPORATION, et al., Defendants.**

**Civil Action No. 5:97–CV–3–M.**

United States District Court,
W.D. Kentucky,
Paducah Division.

Jan. 5, 2004.

---

David Randolph Smith, Edmund J. Schmidt, III, David Randolph Smith & Associates, Nashville, TN, James W. Owens, Paducah, KY, Ronald Simon, Simon & Associates, Washington, DC, for Plaintiffs.

Alan L. Harrington, Kevil, KY, G. Wilson Horde, Kramer, Rayson, Leake, Rodgers & Morgan, Knoxville, TN, Gail C. Ford, Vorys, Sater, Seymour & Pease, LLP, Columbus, OH, Mark C. Whitlow, Whitlow, Roberts, Houston & Straub, Paducah, KY, Robert E. Tait, Vorys, Sater, Seymour & Pease, LLP, Columbus, OH, Joseph DiStefano, Tracy's Landing, MD, for Defendants.

## MEMORANDUM OPINION AND ORDER

McKINLEY, District Judge.

This matter is before the Court on a motion by Defendants for summary judgment [DN 279] and on a motion by Plaintiffs for partial summary judgment [DN 278]. Fully briefed, this matter is ripe for decision. For the reasons set forth below, the motion by the Defendants for summary judgment is granted and the motion by the Plaintiffs for partial summary judgment is denied.

## I. STANDARD OF REVIEW

In order to grant a motion for summary judgment, the Court must find that the pleadings, together with the depositions, interrogatories and affidavits, establish that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56. The moving party bears the initial burden of specifying the basis for its motion and of identifying that portion of the record which demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party is required to do more than simply show that there is some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Co.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The Rule requires the non-moving party to present *"specific facts* showing there is a *genuine issue* for trial."* Fed.R.Civ.P. 56(e) (emphasis added). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. It is against this standard that the Court reviews the following facts.

## II. FACTS

The Paducah Gaseous Diffusion Plant is a government-owned, contractor-operated uranium enrichment facility located approximately ten miles west of Paducah, Kentucky in northwest McCracken County. The Paducah Gaseous Diffusion Plant began operations in 1952. Until it was leased to the United States Enrichment Corporation ("USEC") effective July 1, 1993, PDGP was operated by successive government contractors—Union Carbide Corporation, from 1952 to March 31, 1984; and Martin Marietta Energy Systems, Inc (now Lockheed Martin Energy Systems, Inc.) from April 1, 1984 until June 30, 1993. Lockheed Martin continued to operate PGDP from July 1, 1993 until May 17, 1999, under contract with USEC.

The Plaintiffs in this action reside and/or own real property within ten miles of PGDP in the State of Kentucky. Plaintiffs seek damages for the alleged diminution in the market value of their properties due to alleged soil and/or groundwater contamination caused by the Paducah Gaseous Diffusion Plant operations. Plaintiffs contend that the groundwater and soil contamination constitute an intentional trespass and a permanent private nuisance which has substantially and unreasonably interfered with the use and enjoyment of their property. Plaintiffs further allege that the Defendants are liable for the contamination under a theory of strict liability. Finally, Plaintiffs claim that the facts support a claim for the tort of outrageous conduct.[1] Plaintiffs have moved for partial summary judgment on their claims for nuisance, trespass, and strict liability arguing that

---

1. In addition to their claims for trespass, nuisance, strict liability and outrage, Plaintiffs originally asserted a claim for negligence. Having not responded to the Defendants' motion for summary judgment on the negligence claim, the Court assumes that the Plaintiffs have abandoned this claim and summary judgment in favor of Defendants is granted on the negligence claim.

there is no dispute that there is contamination on Plaintiffs' properties and that the fair market value of the properties have been diminished.

Defendants have also moved for summary judgment arguing that Plaintiffs have no evidence to prove that the levels of contamination are sufficient to pose a health hazard. In the absence of such proof, Defendants argue that Plaintiffs' claims fail.

## III. DISCUSSION

### A. Price–Anderson Act

As a preliminary matter, the present controversy is governed by the Price–Anderson Act ("Price–Anderson" or "the Act"), as amended in 1988, 42 U.S.C. §§ 2011, *et seq.* The Sixth Circuit has summarized the purpose and effect of Price–Anderson as follows:

> The Price–Anderson Act was enacted in 1957 as an amendment to the Atomic Energy Act to encourage private sector investment in the development of nuclear power by limiting the liability of private owners and operators in the event of a nuclear incident. Under the Act, private owners and operators are required to purchase a specified amount of insurance, and damages awards over and above that amount are then indemnified by the government. In August, 1988, Congress enacted the Price–Anderson Amendments Act of 1988, creating a federal cause of action for 'public liability actions' arising from nuclear incidents. The federal courts were granted jurisdiction over these actions, and actions filed in state court were subject to removal. The amendment was not intended to alter the state law nature of the underlying tort claims. It provides that 'the substantive rules for decision in such action shall be derived from the law of the State in which the nuclear inci-

dent occurs, unless such law is inconsistent with the provisions of such section.' *Day v. NLO, Inc.,* 3 F.3d 153, 154 n. 1 (6th Cir.1993) (internal citations to Price–Anderson omitted). As set forth above, Price–Anderson creates a federal cause of action for "public liability actions" arising from "nuclear incidents." The Act defines "public liability," in relevant part, as "any legal liability arising out of or from a nuclear incident," and a "public liability action" as "any suit asserting public liability ." 42 U.S.C. § 2014(w), (hh). "Nuclear incident," in turn, is defined as "any occurrence ... within the United States causing ... bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of property, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material." *Id.* at § 2014(q).

■ Without question, the claims asserted here fall squarely within the statutory language of the Act. Specifically, Plaintiffs' suit asserts "legal liability" for soil and groundwater contamination due to the releases of radioactive substances including neptunium, technicium, and plutonium. As such, Price–Anderson effectively preempts Plaintiffs' state law tort claims. *See Nieman v. NLO, Inc.,* 108 F.3d 1546, 1553 (6th Cir.1997) (holding that Price–Anderson preempted state law trespass claim such that plaintiff could "sue under the Price–Anderson Act, as amended, or not at all."). Even so, Kentucky law still provides the substantive rules in deciding Plaintiffs' "federal" claims, so long as such law is not inconsistent with the Act. 42 U.S.C. § 2014(hh). Accordingly, the Court will look to Kentucky tort law in evaluating the claims.

### B. Nuisance and Trespass

Plaintiffs claim that groundwater and soil contamination of their property result-

ing from the Defendants' release of radioactive contaminants constitute an intentional trespass and a permanent nuisance. Defendants argue that these claims fail because the Plaintiffs concede they cannot prove that the contamination of their property creates an actual health hazard. Plaintiffs, on the other hand, contend that Kentucky law does not require proof of an actual health hazard and argue they have put forth sufficient evidence to survive summary judgment on both claims.

Generally, "nuisances are 'that class of wrongs which arises from the unreasonable, unwarrantable, or unlawful use by a person of his own property and produces such material annoyance, inconvenience, discomfort, or hurt that the law will presume a consequent damage.' " *McGinnis v. Tennessee Gas Pipeline Co.,* 1994 WL 234268, *2 (6th Cir. May 31, 1994)(quoting *City of Somerset v. Sears,* 313 Ky. 784, 233 S.W.2d 530, 532 (1950)). "In order to establish a nuisance, Kentucky law requires an actual physical interference with or harm to the plaintiff's property." *Id.* Pursuant to KRS 411.530(2) "[a] permanent nuisance shall exist if and only if a defendant's use of property causes unreasonable and substantial annoyance to the occupants of the claimant's property or unreasonably interferes with the use and enjoyment of such property, and thereby causes the fair market value of the claimant's property to be materially reduced."

■■■ Trespass occurs when one enters the land of another without consent or privilege. Kentucky law allows recovery under trespass in either of three instances: "(1) the defendant was engaged in an extra-hazardous activity, (2) the defendant committed an intentional trespass or (3) the defendant committed a negligent trespass." *Mercer v. Rockwell International Corp.,* 24 F.Supp.2d 735, 740 (W.D.Ky. 1998). Case law generally distinguishes intentional trespasses and negligent trespasses by requiring harm for negligent trespass. *Id.* at 740 (citing Restatement (Second) Torts § 165 cmt. b.). Thus, in traditional intentional trespass actions, liability is imposed when there is an intrusion, even when it is harmless. *Id.; see also Ellison v. R. & B. Contracting,* 32 S.W.3d 66 (Ky.2000) ("Because a jury could find that a particular injury to the property rights of a plaintiff resulted in no decrease in the property's fair market value, trial courts should, in appropriate trespass cases, also instruct juries that, even if the plaintiff suffered no actual damage as a result of the trespass, the plaintiff is entitled to nominal damages." *Id.* at 71). Liability is imposed for negligent trespasses only when there has been harm to the property. *Mercer,* 24 F.Supp.2d at 740; Restatement (Second) or Torts § 165.

For purposes of this motion for summary judgment, the Court assumes that the Plaintiffs' evidence is sufficient to prove that the Defendants caused their property to be contaminated with technetium and other imperceptible radionuclides resulting in a diminution of property values. Thus, only two pivotal questions remain: first, whether under Kentucky law proof of actual harm is required to state a claim for an intentional trespass caused by imperceptible substances; and second, in both trespass and nuisance claims where contamination is caused by the deposit of imperceptible particles on the property, whether, under Kentucky law, actual harm can only be shown by proof that the level of contamination constitutes an actual health hazard. In determining questions of Kentucky law, the Court follows the decisions of the Kentucky Supreme Court, however, there is no Kentucky Supreme Court opinion which addresses these issues.

[I]f the highest court has not spoken, the federal court must ascertain from all available data what the state law is and apply it. If the state appellate court announces a principle and relies upon it, that is a datum not to be disregarded by the federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.

*Dinsmore Instrument Co. v. Bombardier, Inc.*, 199 F.3d 318, 320 (6th Cir.1999)(citing *Northland Ins. Co. v. Guardsman Products, Inc.*, 141 F.3d 612, 617 (6th Cir.1998); *see also Grego v. Meijer, Inc.*, 187 F.Supp.2d 689, 691 (W.D.Ky.2001)).

### i. Actual Harm

The first question before the Court is whether, under Kentucky law, proof of actual harm is required to state a claim for an intentional trespass caused by imperceptible substances. Plaintiffs maintain that since both the soil and groundwater contamination suffered by them resulted from intentional direct air and liquid releases and discharges by the plant contractors, the trespass alleged is intentional and under traditional intentional trespass law, actual harm is not necessary to maintain an action. *See* Restatement (Second) of Torts § 158 ("One is subject to liability to another for trespass, irrespective of whether he thereby causes harm to any legally protected interest of the other, if he intentionally ... enters land in the possession of the other, or causes a thing or a third person to do so....").

Defendants disagree arguing that Kentucky law requires actual harm when the claimed trespass is by imperceptible particles regardless of whether the trespass is negligent or intentional. Defendants argue that the rule requiring actual harm in both negligent and intentional trespass cases involving imperceptible particles actually originated in the Kentucky law of intentional trespass. *See Mercer*, 24 F.Supp.2d at 741.

Initially, the Court must note that contrary to the Defendants' argument, the actual harm cases involving imperceptible particles did not originate in Kentucky law. In *Mercer*, the district court relied on intentional trespass cases *from other jurisdictions* to predict that Kentucky law requires proof of actual harm demonstrated by a health hazard to prove negligent trespass by imperceptible particles. Although Judge Heyburn in *Mercer* relied on intentional trespass cases, the claim before him was one of negligent trespass; therefore, he was not required to, nor did he, predict whether Kentucky law would require actual harm in an intentional trespass case under these circumstances. There are no Kentucky cases which specifically address this issue. To predict whether the Kentucky Supreme Court, despite traditional intentional trespass law, would require proof of actual harm to the property where the claimed intentional trespass is by imperceptible particles, the Court will examine the interest protected in a trespass action and some historical cases dealing with trespasses by invisible entries.[2]

■ A trespass is designed to protect against interference with an owner's right to exclusive possession of his property, and not just mere entry. *Mercer*, 24 F.Supp.2d at 741 (citing W. Page Keeton, et al., Prosser and Keeton in the Law of Torts, § 13 at 71 (5th Ed.1984)). Entry normally would qualify as interference; however, not every touching of the land interferes with the right to exclusive possession of the property. *Id.* "Although the 'right to exclusive possession' is liberally interpreted so as to not subject property

**2.** Many of the same cases discussed herein were relied upon by Judge Heyburn in *Mercer*.

owners to most uninvited intrusions, some entries may be so insubstantial or so trifling that they will not infringe upon the legally protected interest in freedom from interference with exclusive possession." *Id.* (citing *Martin v. Reynolds Metals Co.,* 221 Or. 86, 342 P.2d 790 (1959), *cert. denied,* 362 U.S. 918, 80 S.Ct. 672, 4 L.Ed.2d 739 (1960)).

Application of trespass to the entry onto property of invisible or microscopic particles traces its origins to the 1959 case of *Martin v. Reynolds Metals Co.,* 221 Or. 86, 342 P.2d 790 (1959). *See* Lawrence G. Cetrulo, Toxic Torts Litigation Guide, § 2:17; *Mercer,* 24 F.Supp.2d at 741. In *Martin,* the plaintiffs brought a claim for intentional trespass against the defendant aluminum reduction plant. The Supreme Court of Oregon ruled that a trespass occurred when emissions from the plant were deposited on adjacent farmland rendering it unsuitable for grazing. While the fluoride particle emissions were invisible to the naked eye, the court found a trespass to exist, reasoning that it was not the size of the object that invaded the land that was material, but rather, the harm that resulted from the invasion to the legally protected interest in exclusive possession of the land. *Id.* at 794. The *Martin* court recognized, however, that in ruling that a trespass could be effected by unseen microscopic particles, the holding might render trespass indistinguishable from other causes of action such as nuisance and "emphasized that trespass protects the right of exclusive possession, i.e. one's sense of ownership." *Mercer,* 24 F.Supp.2d at 741; *Martin,* 342 P.2d at 794–796. Therefore, the court held that for such an action to succeed a plaintiff must allege that the microscopic trespass, whether intentional or not, caused actual harm. In so doing, the Court offered helpful insight into the interest protected in a trespass action:

[In every case in which trespass is alleged] the court is presented with a problem of deciding whether the defendant's intrusion has violated a legally protected interest of the plaintiff. In most cases the defendant's conduct so clearly invades the well established possessory interest of the plaintiff that no discussion of the point is called for. . . . There is a point where the entry is so lacking in substance that the law will refuse to recognize it, applying the maxim *de minimis non curat lex.* Thus, it would seem clear that ordinarily casting of a grain of sand upon another's land would not be a trespass. . . . [W]here the [substance] is cast upon the plaintiff's premises in a manner which does no actual damage or causes no interference in any way with a legitimate use of the premises then there is no reason for recognizing an invasion of the plaintiff's possessory interest.

*Mercer,* 24 F.Supp.2d at 741 (quoting *Martin,* 342 P.2d at 793–795).

Other courts have followed *Martin* in holding that a trespass by invisible particles is actionable; but, these courts likewise find it actionable only if actual damage to the property results. For example, the Supreme Court of Alabama held that a plaintiff may bring an intentional trespass claim for the invasion of invisible lead particles if "the polluting substance is deposited upon the plaintiff's property, thus interfering with his exclusive possessory interest by causing substantial damage to the Res." *Borland v. Sanders Lead Co., Inc.,* 369 So.2d 523, 530 (Ala.1979). Similarly, the Supreme Court of Washington in *Bradley v. American Smelting & Refining Co.,* 635 F.Supp. 1154 (W.D.Wash.1986), held that before a plaintiff can recover for intentional trespass caused by imperceptible particulate emissions actual and substantial damage to the

property must be demonstrated. The court in *Bradley* reached this decision after considering the ramifications of allowing landowners to bring an intentional trespass claim for such imperceptible particles without an actual harm requirement:

> While at common law any trespass entitled a landowner to recover nominal or punitive damages for the invasion of his property, such a rule is not appropriate under the circumstances before us. No useful purpose would be served by sanctioning actions in trespass by every landowner within a hundred miles of a manufacturing plant. Manufacturers would be harassed and the litigious few would cause the escalation of costs to the detriment of the many.... [T]he plaintiff who cannot show that actual and substantial damages have been suffered should be subject to dismissal of his cause upon a motion for summary judgment.

*Id.* at 742–73.

A similar rationale was used by the Kentucky Court of Appeals in *Rockwell International Corp. v. Wilhite*, 2003 WL 21826306 (Ky.App. August 8, 2003)[3], in determining that proof of a health hazard was required to demonstrate actual harm in a negligent trespass case. The court of appeals held that if it was to allow a cause of action for negligent trespass in cases where the amount of the imperceptible substance did not present a health hazard, "[s]uch a decision would open the proverbial floodgates of litigation, allowing a suit to proceed any time a landowner can show the presence, however minute, of a substance known to be harmful in greater concentrations." *Wilhite*, 2003 WL 21826306, *12.

█ Ultimately, these cases, along with the district court in *Mercer*, recognized that when the substance or "thing" that has entered the plaintiff's property is imperceptible to ordinary human senses, it does not so obviously infringe upon a landowner's right to exclusive possession. As a result, "only when the substance actually damages the property does it intrude upon the landowner's right to exclusive possession" and become an actionable trespass. *Mercer*, 24 F.Supp.2d at 743. This is the case whether the trespass is alleged to be intentional as in *Martin* or *Bradley* or negligent as in *Mercer* and *Wilhite*. After a review of all of these cases, and considering the potential of opening the "proverbial floodgates of litigation" if the Court were to reach a contrary decision, the Court concludes that the Kentucky Supreme Court would depart from traditional intentional trespass law and hold that a trespass by an imperceptible particle or substance, whether intentional or not, is actionable only if actual harm to the property results.

### ii. Health Hazard

Having resolved the first question, the Court must turn to the second question: whether, under Kentucky law, in both trespass and nuisance claims, where contamination is caused by the deposit of imperceptible particles on the property, actual harm can only be shown by proof that the level of contamination constitutes an actual health hazard. In order to predict how the Kentucky Supreme Court would decide this question, the Court will begin by examining two cases which address the issue.

In *Mercer v. Rockwell International Corp.*, 24 F.Supp.2d 735, 741 (W.D.Ky. 1998), the owners of property located along a contaminated river sued the owner of a manufacturing plant for negligent trespass alleging that the plant's discharge

---

**3.** *See supra,* section III(B)(ii), for further discussion of *Wilhite*.

of PCBs into a drainage system caused damage to their property. The district court in *Mercer* was faced with the issue of whether Kentucky law requires proof of a health hazard to prove negligent trespass by imperceptible particles. In predicting what the Kentucky Supreme Court would do if faced with this issue, the district court observed:

> When an object can be seen or sensed in some manner, one may even assume that a landowner's right to exclusively possess his property is infringed. When the "thing" that has entered plaintiff's property is imperceptible to ordinary human senses, it does not so obviously infringe upon a landowner's right to exclusive possession. In such cases, only when the substance actually damages the property does it intrude upon the landowner's right to exclusive possession. Therefore, an essential element of Plaintiffs' claim is that the [PCBs] interfere with their right to exclusive possession by causing actual harm to the property.

*Mercer*, 24 F.Supp.2d at 743. The district court concluded that the only way to demonstrate harm to the property is to show that the levels of contamination on the property are a health hazard. *Id.* at 745. Furthermore, the district court rejected the plaintiffs argument that the diminution in the fair market value of the land constituted harm to their property. The Court concluded that a decrease in fair market value is not harm—but only a means of measuring the harm. *Id.* at 743.

Similarly, in *Rockwell International Corp. v. Wilhite*, 2003 WL 21826306 (Ky. App. August 8, 2003), landowners brought an action against Rockwell alleging claims for trespass and nuisance for the contamination of their property with PCBs caused by the corporation's release of PCBs into a river. The Kentucky Court of Appeals relied upon the reasoning set forth in *Mercer* and determined that in order to recover for trespass of an imperceptible substance a plaintiff must prove that the substance caused actual harm to the property by creating a health hazard. *Id.* at *12. With respect to the nuisance claim, the court of appeals concluded that where the substance alleged to be the nuisance is imperceptible to ordinary persons, Kentucky law would likewise require "a scientifically demonstrable health or safety hazard before the alleged nuisance can be said to interfere with the use of a piece of property." *Id.* at *21 n. 106. Essentially, the Kentucky Court of Appeals concluded as a matter of law that absent a scientific demonstrable health or safety hazard from the contamination of the land by an imperceptible substance, any annoyance or interference with the use and enjoyment of the land is unreasonable and the result of an irrational fear of the contaminants. *Id.* at *17.

Plaintiffs urge the Court to disregard the *Mercer* and *Wilhite* cases and to adopt instead the reasoning set forth in *Cook v. Rockwell International Corp.*, 273 F.Supp.2d 1175 (D.Colo.2003). In *Cook*, the district court held that owners of properties near a former nuclear weapons manufacturing plant were not required to prove an actual or verifiable health risk resulting from the presence of plutonium and other plant contaminants on their property in order to establish liability for trespass or nuisance. In so concluding, the district court examined the Restatement (Second) of Torts § 821F and its supporting commentary and a recent Colorado Supreme Court case, *Hoery v. United States*, 64 P.3d 214 (Colo.2003), which held that the migration and presence of contaminants upon another's property constitute a physical invasion that is actionable under the traditional rule of trespass regardless of whether the contaminants cre-

ate an actual health risk. While the Court finds the *Cook* decision very well reasoned, the Court concludes that the Kentucky Supreme Court would not adopt the reasoning of *Cook*.

The district court in *Cook* relied upon Section 821F of the Restatement and its supporting commentary to support the court's conclusion that a health risk is not an element of a private nuisance claim. Section 821F states that "[t]here is liability for a nuisance only to those to whom it causes significant harm, of a kind that would be suffered by a normal person in the community or by property in normal condition and used for a normal purpose." The district court found support for its decision in the comments to this section which provide in relevant part: "[i]n determining whether the harm would be suffered by a normal member of the community, fears and other mental reactions common to the community are to be taken into account, *even though they may be without scientific foundation or other support in fact*." Restatement (Second) of Torts § 821F comment f. Additionally, this comment explains that a landowner's fear of possible contagion from a neighboring leprosy sanitarium can disturb his peace of mind sufficiently for it to constitute a private nuisance, even though the possibility of contagion is so remote that this fear is unfounded as a practical matter. *See id.; Cook*, 273 F.Supp.2d at 1204. Relying on this comment, the district court in *Cook* concluded that

> the existence of contamination on a property may constitute a nuisance, even if it does not pose a currently measurable or verifiable risk to the property or its occupants, if the jury finds the contamination, alone or in combination with other alleged factors of interference, would cause a normal member of the community in the same or similar circumstances to experience

sufficient fear, anxiety or other discomfort that the community member would find the contamination (and/or other factors of interference) seriously offensive, annoying or inconvenient.

*Cook*, 273 F.Supp.2d at 1204 (citing Restatement, § 821F cmt d).

The Court recognizes that the Restatement of Torts is frequently relied upon by the Kentucky courts in deciding questions of tort law. However, comment f of Section 821F appears to be. inconsistent with prevailing Kentucky law. For example, in *McCaw v. Harrison*, 259 S.W.2d 457 (Ky. 1953), diary farmers sued to enjoin the proposed use of adjoining property for commercial cemetery purposes. The highest court in Kentucky held that "[a] cemetery does not constitute a nuisance merely because it is a constant reminder of death and has a depressing influence on the minds of persons who observe it, or because it tends to depreciate the value of property in the neighborhood, or is offensive to the aesthetic sense of an adjoining proprietor." *Id.* at 458. Instead, the highest court concluded that "[i]f the location or maintenance of a cemetery *endangers the public health*, either by corrupting the surrounding atmosphere, or water of wells or springs, it constitutes a nuisance." *Id.* (emphasis added). This case is clearly contrary to the notion that the Kentucky Supreme Court would permit recovery for "fears and other mental reactions ... even though they may be without scientific foundation or support in fact." Restatement (Second) of Torts § 821F cmt. f.

There are other Kentucky cases which lend support for the conclusion that the Kentucky Supreme Court would reject *Cook* and comment f of this Restatement. Kentucky law does not allow recovery for stigma or fear absent some physical harm to the property. In *Morgan v. Hightow-*

er's Adm'r, 291 Ky. 58, 163 S.W.2d 21 (1942), the court held that a trespass action will not lie for damage to reputation of property where a suicide had occurred absent actual physical interference with the property. *Id.* at 22. Similarly, in the *City of Louisville v. Munro*, 475 S.W.2d 479 (Ky.1971), property owners brought an action for nuisance for depreciation of the value of their residential property for establishment of the city zoo next door. The highest court in Kentucky held that the zoo was not a nuisance per se and that a showing that the plaintiffs were annoyed by the presence of the zoo next door was insufficient to establish nuisance in the absence of showing material interference with ordinary physical comfort or reasonable use of plaintiffs' property. *Id.* at 482. *See also Mercer*, 24 F.Supp.2d at 744 ("Kentucky law will not allow recovery for stigma absent some physical harm to the property."). *See also* KRS § 411.560(3) (A plaintiff in a nuisance action may recover a loss in property value caused by the nuisance, but "[n]o damages shall be awarded for annoyance, discomfort, sickness, emotional distress or similar claims.").

Both the *Morgan* and *Munro* cases are consistent with Judge Huddleston's determination in *Wilhite* that Kentucky law does not allow relief on the basis of annoyance or interference sustained by landowners as a result of irrational fears or unsubstantiated phobias regarding the contaminants. *Wilhite*, 2003 WL 21826306, *17. Given the Kentucky Supreme Court's decisions in *McCaw*, *Morgan*, and *Munro*, as well as the Kentucky Court of Appeals' decision in *Wilhite*, *supra*, the Court concludes that the Kentucky Supreme Court would not adopt *Cook* or follow Restatement (Second) of Torts § 821F comment f.

Finally, an examination of the recent Kentucky Supreme Court opinion in *Wood*

*v. Wyeth–Ayerst Laboratories*, 82 S.W.3d 849, 855 (Ky.2002), also aids in the determination of this issue. In *Wood*, the plaintiff was seeking compensation for her exposure to the drug fenfluramine on the basis of negligence and strict liability. At the time of her lawsuit, Wood had suffered no physical harm as a result of her ingestion of Fen–Phen. The Kentucky Supreme Court held that "a plaintiff [must] sustain an actual physical injury to her person, rather than mere exposure to a potentially toxic substance, before it would allow recovery." *Wilhite*, 2003 WL 21826306 at *14 (citing *Wood*, 82 S.W.3d at 855). The Kentucky Court of Appeals in *Wilhite* noted that the presence of PCBs on the Plaintiffs' land can be likened to Wood's ingestation of fenfluramine. *Id.* In the present case, the landowners' theory that the presence of technetium on their land alone should be recognized as an injury "is analogous to Wood's position regarding her having ingested a potentially harmful or toxic substance (*i.e.*, its mere presence in her body), a theory rejected by the Supreme Court." *Id.* If the Court were to permit the landowners in this case to recover for mere presence of toxic substance on their land without proof of a resulting health or safety hazard, "it would result in an allowance of recovery for alleged injury to property in instances in which individuals who have ingested a toxic substance may not recover." *Id.*

■■ After examining the relevant case law, and for the reasons set forth above, the Court predicts that the Kentucky Supreme Court would conclude, consistent with *Wilhite* and *Mercer*, that the invasion of property by contaminants which are imperceptible to ordinary persons cannot, as a matter of law, support either a nuisance or a trespass (negligent or intentional) claim absent proof that the contaminants constitute "a scientifically

demonstrable health or safety hazard" at the levels shown to be present on the property. *Wilhite*, 2003 WL 21826306, *21 n. 106. Because Plaintiffs concede they cannot prove contamination at levels that pose a "significant health risk," summary judgment is granted in favor of the Defendants on Plaintiffs' intentional trespass and nuisance claims.

## C. Strict Liability

Plaintiffs argue that Defendants are strictly liable for the release of radiological waste because such a release is an abnormally dangerous activity under Restatement (Second) of Torts §§ 519 and 520. Restatement (Second) of Torts § 519 provides that "[o]ne who carries on an abnormally dangerous activity is subject to liability for harm to the person, land, or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm." Restatement (Second) of Torts § 519(1). Defendants argue that this claim must fail for the same reason the nuisance and trespass claim fail—that Plaintiffs have offered no evidence of a health hazard as a result of the contamination. The Court agrees.

█ Section 519 of the Restatement requires proof of "harm to the ... land" before strict liability can be imposed. As discussed in the section above, under Kentucky law, where the alleged harm to the land is caused by contamination of property by imperceptible particles, the only way to demonstrate actual harm to the land is to prove that the level of contamination found on the land presents a health hazard. *Wilhite*, 2003 WL 21826306, *12; *Mercer*, 24 F.Supp.2d at 745. *See also Wood v. Wyeth–Ayerst Laboratories*, 82 S.W.3d 849, 851–852 (Ky.2002) ("recovery on a theory of tort, like negligence or strict liability as sought here, requires a plaintiff

to show some present physical injury to support a cause of action."). Having failed to prove a health hazard from the present contamination, Plaintiffs' strict liability claim likewise fails.

## D. Outrage

Plaintiffs assert that Defendants are liable to them for the severe emotional distress caused by the Defendants' outrageous conduct. Complaint ¶ 54. Plaintiffs argue that the intentional exposure to radiological contamination caused by Defendants is "utterly intolerable in a civilized community." *Capital Holding Corp. v. Bailey*, 873 S.W.2d 187 (Ky.1994).

█ The tort of outrage was first recognized by the Kentucky Supreme Court in *Craft v. Rice*, 671 S.W.2d 247, 251 (Ky. 1984). The court adopted the traditional form of the tort found in the Restatement (Second) of Torts § 46 (1965): "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." *Id.* at 251. Elements of proof necessary to sustain a cause of action for the tort of outrage are: (1) the wrongdoer's conduct must be intentional or reckless; (2) the conduct must be outrageous and intolerable in that it offends against the generally accepted standards of decency and morality; (3) there must be a causal connection between the wrongdoer's conduct and the emotional distress; and (4) the emotional distress must be severe. *Kroger Co. v. Willgruber*, 920 S.W.2d 61 (Ky.1996); *Humana of Kentucky, Inc. v. Seitz*, 796 S.W.2d 1 (Ky. 1990); *Craft*, 671 S.W.2d at 251.

█ Kentucky courts have expressly adopted such a "restrictive" view of the tort of outrage. *Kroger Co.*, 920 S.W.2d at

65; *Humana,* 796 S.W.2d at 3; *Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796, 805–06 (6th Cir.1994). The conduct must be extreme and outrageous to the average citizen; the plaintiff's mere "belief" that the conduct is outrageous is insufficient. *Bevins v. Dollar General Corp.,* 952 F.Supp. 504, 510 (E.D.Ky.1997) (citing *Humana,* 796 S.W.2d at 4).

Comment d. to the Restatement outlines the type of conduct which is contemplated under the rule:

> It has not been enough that the defendant has acted with an intent which is tortious ..., or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice".... Liability has been found where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!" The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppression, or other trivialities.

▮ Plaintiffs have failed to offer any evidence that the Defendants' conduct was intentional or reckless as those terms are defined by the Restatement and *Craft.* "This element is satisfied where the wrongdoer had the specific purpose of inflicting emotional distress or where he intended his specific conduct and knew or should have known that emotional distress would likely result." *Craft,* 671 S.W.2d at 249. *See also* Restatement (Second) of

Torts § 46 cmt. i. (The rule applies only "where the actor desires to inflict severe emotional distress .... also, where he acts recklessly .... in deliberate disregard of a high degree of probability that emotional distress will follow."). Plaintiffs have not shown that the Defendants in releasing these radionuclides did so for the purpose of inflicting emotional distress on the surrounding property owners. Similarly, Plaintiffs have offered no supporting evidence that the Defendants, at the time of the releases, knew of or disregarded a "high degree of probability" that the surrounding property owners would suffer severe emotional distress as a result of the releases.

Additionally, Plaintiffs may recover under the tort of outrage only where the emotional distress is severe. "The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it." Restatement (Second) of Torts § 46 cmt j. Plaintiffs have failed to offer any proof concerning the severe emotional distress they have allegedly suffered. Claims that the Plaintiffs are concerned or worried about the contamination or that they no longer grow gardens on their property because of fear of the contamination are not sufficient to demonstrate severe emotional distress under the facts of this case. As recognized in comment j of the Restatement, "distress must be reasonable and justified under the circumstances." In *Wilhite,* absent a scientific demonstrable health or safety hazard from the contamination of the land by an imperceptible substance, any annoyance or interference with the use and enjoyment of the land is unreasonable and the result of an irrational fear of the contaminants. *Wilhite,* 2003 WL 21826306 at *17.[4]

---

4. Furthermore, an argument could be made that under the Price–Anderson Act, in the

absence of any physical harm to the property, Plaintiffs' outrage claim fails to satisfy the

For these reasons, the Court concludes that summary judgment in favor of the Defendants is proper on Plaintiffs' tort of outrage claim.

## IV. CONCLUSION

The Plaintiffs have put forth sufficient evidence to show contamination of their properties by certain radionuclides. Likewise, Plaintiffs have sufficient evidence to show their property values have suffered as a result. Their concern is real and understandable. Unfortunately, however, the law requires more in these circumstances. The law requires that Plaintiff's concerns be based on proof that the contamination is at a level which is harmful to their health. Since the Plaintiffs cannot prove a health hazard, their claims must fail.

For the reasons set forth above, **IT IS HEREBY ORDERED** that the Defendants' motion for summary judgment [DN 279] is **granted** and the Plaintiffs' motion for partial summary judgment [DN 278] is **denied. IT IS FURTHER ORDERED** that as a result of this decision, all remaining pending motions are rendered moot. A judgment shall be entered consistent with this opinion.

Price–Anderson jurisdictional prerequisite of physical harm and the claim cannot survive summary judgment. *See In re Berg Litigation,* 293 F.3d 1127 (9th Cir.2002)("[p]hysical harm to persons or property is thus a jurisdictional prerequisite"); 42 U.S.C. § 2014(q)("bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of property").